LABORDE, Judge.
The defendant-appellant, Issac (“T-Ike”) Williams, Jr., was convicted by a jury of 12 of armed robbery and attempted second degree murder. He was sentenced to serve concurrent sentences of 40 years at hard labor for the attempted murder conviction and 25 years for the armed robbery conviction. Defendant now appeals. His sole assignment of error is that there was insufficient identification evidence for a jury to convict him. Finding no merit to this contention, we affirm.
FACTS
The victim, Ray Robin, is a white male who was employed by Bayouland Seafood in Cecilia to make seafood deliveries. On February 28, 1986, Robin made a delivery in Shreveport. He was driving a white van. Inside the van he had a brown briefcase containing the day’s receipts and a .22 caliber pistol. He kept the cash receipts ($100-$200) on his person. On his way back to his home in Breaux Bridge, Robin stopped at a friend’s daiquiri bar in Alexandria and had 3-4 drinks. He remained there from about 8:00 p.m. until around midnight. He then got back in his van and proceeded to drive toward Breaux Bridge on Highway 71. As the victim passed through Lecompte he noticed a young black kid (about 14 or 15 years old) hitchhiking. Since it was so cold outside, he decided to give him a ride. The kid got into the van and it was then that Robin noticed that there was another older black man with the kid. Robin drove the two to Che-neyville where he dropped the kid off. Robin and the other man then proceeded to Bunkie where they stopped off at the Oak Street Bar. The victim had a few more drinks and played pool there with the hitchhiker and another black male. As the victim was about to leave for Breaux Bridge, the other man (not the hitchhiker) asked *528 for a ride. The victim identified this man as the defendant, Issac Williams, Jr.
Williams asked Robin to bring him to Opelousas where they stopped at two houses at William’s request. However, Williams returned to the van and when Robin asked him where he wanted to get out, he replied, “I’ll just keep riding.” They stopped at a gas station in Opelousas, however, this station did not have diesel, so they were unable to purchase any fuel. The two continued on to Lafayette, but ran out of fuel there. Robin then got out of the van to walk to go get fuel leaving the briefcase in the van. Williams remained behind. Due to the cold weather, Robin ran toward a service station, but became winded and collapsed on the ground. Williams caught up with him. They then went to the station, bought some fuel, put it in the tank, and returned to the station to fill up the tank. Upon leaving the station, Williams told Robin to bring him back home. Robin responded that it was too far, but that he would bring him back to Ville Platte. They proceeded back toward Ville Platte. Williams then told Robin “you gonna take me home.” Robin again said that he would only go as far as Ville Platte. Williams then pulled out a gun and shot Robin in the stomach. Robin stopped the van on the side of the road and struggled with Williams. Williams then apparently regained control of the situation pointing the gun at Robin’s head. Robin begged him not to shoot saying that he had a wife and daughter. Williams told Robin to get out of the van. Robin got out and stumbled toward the back of the van and fell to the ground. Williams also got out of the van, took the money from Robin’s wallet and threw the wallet back at Robin. Williams returned to the van and attempted to back over Robin, who was fortunately able to roll off of the road. Williams then drove away. Robin was able to crawl back toward the highway where he was later spotted by a police officer driving in the area.
A few days later, Robin’s white van was found in Cheneyville. The briefcase was still in the van, but had been pried open and the gun was not in it. The Cheneyville Police Department notified police from St. Landry Parish, who were investigating the armed robbery/attempted murder, that Williams had been seen exiting the van.
ASSIGNMENT OF ERROR
Williams contends that there was insufficient evidence presented at trial to identify him as the perpetrator of the above-described crime. He claims that he was convicted solely on the testimony of Robin and that Robin’s testimony is inconsistent, lacked veracity and should not have been relied upon.
Robin remained in the hospital for nine days after being shot. During that time he was shown a photograph lineup which included a picture of the defendant. He was unable to identify anyone from that lineup. On March 21, 1986, Robin gave police a detailed statement of the incident. That statement was virtually the same that he gave at trial (and similar to the facts as recited herein). However, in that statement Robin alleged that it was the older of the two hitchhikers that he had picked up in Lecompte who left the bar with him and ultimately shot and robbed him. A few days later Todd Ortis, a detective in the St. Landry Parish Police Department, drove Robin to the home of Issac Williams. Ortis called “T-Ike” to come talk to them. He stood outside of the police car only a few feet away, but Robin could not identify him. Robin testified at trial that Ortis had told him that Williams was the person who was found with the van and if he identified him as the assailant “he may spend the rest of his life in jail.” Robin said that he did not want to send a man to jail whom he could not positively identify.
After failing to identify Williams, Ortis suggested that Robin retrace the events of the night he was shot. They went to the Oak Street Bar and Robin remembered it as the bar he had gone to with the hitchhiker. He walked around the bar and looked at the pool table. He stated at trial that returning to the bar jarred his memory and he then realized that it was not the hitchhiker that had left the bar with him, but a *529 different man, the other man he had played pool with that night. Robin stated that he remembered clearly seeing that man’s face under the light located over the pool table. He testified that that man was Issac Williams and it was Williams who shot him. Robin and Ortis then went to Williams’ house where Robin positively identified him as the assailant. Robin said that he recognized Williams’ face and also his voice. Robin testified that he felt that the fact that he was intoxicated on that night along with the shock of being shot and remaining in the hospital for nine days, had blurred his memory. He claimed, however, that by returning to the bar, his ability to recall the events of that night were greatly improved.
Williams’ version of how he came into possession of the van is different from Robin’s. He claims that on Saturday, March 1, 1986, at about 11:00 a.m. he was at Mayberry’s food center in Bunkie. A hooded black man with long hair, a beard, and a gold tooth named Adwa drove the van into the parking lot and asked “T-Ike” to “chill out” with him. They rode around town drinking. Adwa then got out of the van and told Williams, “Man you could ride in the van.” Williams picked up some “drinking friends” and asked them to ride to Texas with him. They rode around for awhile, but Williams eventually dropped them off and picked up Adwa at the store. They then drove around drinking some more and took some pink pills. Williams claims to have passed out and when he woke up it was Sunday morning and he was in the van in Cheneyville. He then says he jumped out of the van and ran to the police station to get a ride back to Bunkie. Williams had never seen Adwa before he picked him up, nor has he seen him since. There was no other testimony at trial concerning the existence of the mysterious Adwa.
Williams contends that Robin’s testimony is inconsistent and unreliable. He alleges that, without Robin’s testimony, there was virtually no evidence against him. We agree that the inconsistencies in Robin’s testimony and his inability to identify Williams prior to returning to the Oak Street Bar make his testimony somewhat suspect. (We also find the candor of Williams’ testimony to be questionable.) Without more, a jury would have probably been hard pressed to convict Williams. However, contrary to Williams’ assertion, there was more, and the testimony of other witnesses amply supports his conviction.
The strongest testimony against Williams came from Wilton Davis, a cab driver from Opelousas and Darlene Brous-sard, who worked at the Charter Market in Opelousas. Both positively identified Williams as coming into the market on the evening in question and asking where he could purchase some diesel fuel. Davis testified that he has a good memory and said “I don’t forget a face.” He remembered Williams asking for directions and testified that Williams made him mad because he could not understand when Davis tried to explain to him where to go to get fuel. Broussard testified that she saw Williams and a white man drive up in a van in the parking lot of the market. She stated that she had no doubt in her mind that Williams was the man that she had seen. She also saw Williams talking to Davis. She said that Williams told her he had been in Texas and had a dead body in the back of the van. He appeared to be intoxicated. When he walked outside of the store she called the police. She was able to identify Williams out of a photo lineup.
Henry Sutherland also testified at trial. He worked the late night shift at the Texaco station in Lafayette where Robin and Williams ultimately purchased fuel. He remembered Robin coming into the station with a black male. He said that both men appeared to be intoxicated. Sutherland remembered Robin, but could not identify Williams. He said that Williams had a similar build to the black man he saw with Robin, but could not say whether or not Williams was the man.
Also testifying at defendant’s trial was Arthur Reed, the owner of the Oak Street Bar. Reed remembered Robin being in the bar that night and remembered seeing him playing pool. Reed knew Williams and remembered that he was also in the bar that night. Reed estimated that there were around 30 people in the Oak Street Bar that evening.
*530 Finally the testimony of Dwayne Patterson and Lionel Zone was damaging to defendant. Patterson and Zone were the two “drinking friends” who Williams picked up on Saturday afternoon. Both testified that Williams picked them up in the white van and told them that he was taking them to Galveston. Because Williams was driving too fast, they made him take them back home. Zone also testified that he had earlier seen Williams at Mayberry’s that morning at about 8:30 a.m. Zone said that Williams had about $60.00 in cash, a brown briefcase, and a small gun in his possession.
In reviewing the sufficiency of evidence presented at trial, we must determine whether any rational fact finder, viewing the evidence in the light most favorable to the prosecution, would have found that the essential elements of the charged crimes were proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Although Robin’s testimony appears to be questionable, we find that the other testimony and evidence presented at trial was more than adequate to support the jury’s finding that defendant was guilty of the charged crime. The convictions of Issac Williams, Jr. of attempted second degree murder and armed robbery and concurrent sentences of forty and twenty-five years are thus affirmed.
AFFIRMED.